788

## OHIO CASUALTY INS. CO. v. CALLAWAY et al.
### No. 2614.

Circuit Court of Appeals, Tenth Circuit.
March 16, 1943.

Clayton B. Pierce, of Oklahoma City, Okl., for appellant.

James Z. Barker, of Clinton, Okl. (Arney & Barker, of Clinton, Okl., Tolbert, Tolbert & Gillespie, of Hobart, Okl., and Edwards & Edwards, of Cordell, Okl., on the brief), for appellee.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

The appellant, Ohio Casualty Insurance Company, commenced this action for a declaratory judgment, adjudicating its liability under a public liability insurance policy which it issued to the appellee, W. L. Callaway, covering a butane truck owned and operated by Callaway in his business as a dealer of a petroleum product called butane. The policy, as issued and delivered by the policy writing agent, contained a general endorsement excluding from the coverage of the policy any loss, claim, or damage, resulting from fire, combustion, or explosion of any commodities being loaded on, unloaded from, or transported on, any vehicle insured. The complaint also named as parties defendant others who had asserted claims against the insured as a result of an explosion of butane while being transported on the insured butane truck.

The insured, appellee, and others, answered alleging that the policy containing the exclusion endorsement did not conform to an antecedent oral agreement between the insured and the policy writing agent, by the terms of which the agent represented that the policy to be written fully covered the operations of the butane truck against all losses for "every accident, every fire, and every damage"; that he had no knowledge of the attachment of the said endorsement until after the loss had occurred; that he never had assented to the endorsement or in any manner ratified the same. The insured, joined by others as-

serting claims against him, prayed that the policy be reformed to comply with the antecedent oral agreement, and as reformed declared a binding contract between the parties.

The trial court held that by reason of the conduct and representations of the agent of the insurer, the appellees were "entitled to have the liability policy reformed to comply with the true agreement as formed by the representations of the insurance company's agent, as accepted by the insured, that is, the protection otherwise afforded after the general exclusion endorsement is eliminated." D.C., 45 F. Supp. 586, 588.

It is a rule of universal application that where parties orally agree upon the terms of a written contract, but either through mutual mistake or through mistake on the part of one, and fraud or inequitable conduct on the part of the other, the written agreement drafted to evidence the oral contract fails to express the real agreement and intention of the parties, equity may grant reformation of the written contract to comply with the antecedent oral agreement.[1] But courts of equity will not make a contract for the parties, and evidence of mutual mistake, fraud, or inequitable conduct relied upon to support reformation must be shown by proof of the greatest and most satisfactory character, and the parties seeking reformation must also be free from fraud, inequitable conduct, or negligence.[2] The scope of in-

quiry then is limited to the question whether the facts on which the judgment of the trial court is based meets the required degree of proof.

In the latter part of August 1941, the appellee, Callaway, purchased a truck from one Hagan, to which was attached two butane tanks which had been used by Hagan, and were to be used by Callaway for the transportation of butane gas in furtherance of the business which Callaway had also purchased from Hagan. To finance the transaction, Callaway negotiated a loan with a bank in Cordell, Oklahoma, giving his note and a mortgage on the truck therefor, and his mother became surety on the notes. The bank required insurance on the truck against loss by fire, and accordingly Callaway called Knie, agent for appellee, to the bank for the purpose of arranging the required insurance. In the presence of Callaway, his mother, and the banker, Knie agreed to and did subsequently write and deliver to the bank an insurance policy covering the truck against loss by fire. At the same time, Knie told Callaway and his mother that he should also have public liability insurance; that he "might run into somebody". Knie quoted the rates and Callaway agreed to take the policy. According to the testimony of Callaway, he asked Knie, "Now Bob, am I fully covered on liability? He said I was." When Callaway went to Knie's office to get his identification card for the policy, "I asked him again

[1] Snell v. Insurance Co., 98 U.S. 85, 25 L.Ed. 52; Hayes v. Travelers' Insurance Co., 10 Cir., 93 F.2d 568, 125 A.L.R. 1053; Home Insurance Co. of New York v. Sullivan Machinery Co., 10 Cir., 64 F.2d 765; Commercial Casualty Insurance Co. v. Lawhead, 4 Cir., 62 F.2d 928; Kansas City Life Insurance Co. v. Cox, 6 Cir., 104 F.2d 321; Security Insurance Co. v. Deal, 175 Okl. 450, 53 P.2d 271; Commercial Casualty Insurance Co. v. Connellee, 156 Okl. 170, 9 P. 2d 952; Commercial Casualty Insurance Co. v. Varner, 160 Okl. 141, 16 P.2d 118; Kansas Amusement Co. v. Maryland Casualty Co., 122 Kan. 800, 253 P. 405; Veitch v. Massachusetts Bonding & Insurance Co., Mo.App., 226 S.W. 658; Connecticut Fire Insurance Co. v. Wigginton, 134 Ark. 152, 203 S.W. 844; Giammares v. Allemania Fire Insurance Co., 89 N.J.Eq. 460, 105 A. 611; Georgia Casualty Co. v. Bond-Foley Lumber Co., 187 Ky. 511, 219 S.W. 442; Journal Co. v. General Accident Fire & Life Insurance Corp., 188 Wis. 140, 205 N.W. 800; Robinson v. Union Automobile Insurance Co., 112 Neb. 32, 198 N.W. 166; Merchants' & Manufacturers' Inter-Insurance Alliance v. Hansen, Tex.Civ. App., 258 S.W. 257; Norem v. Iowa Implement Mutual Insurance Ass'n, 196 Iowa 983, 195 N.W. 725; Back v. People's National Fire Insurance Co., 97 Conn. 336, 116 A. 603; Couch on Insurance, Vol. 6, Sec. 1391 et seq.; 29 American Jurisprudence, Sec. 241.

[2] Hayes v. Travelers' Insurance Co., 10 Cir., 93 F.2d 568, 125 A.L.R. 1053; Kelly-Dempsey & Co. v. Century Indemnity Co., 10 Cir., 77 F.2d 85; Columbian National Life Insurance Co. v. Black, 10 Cir., 35 F.2d 571, 71 A.L.R. 128; Connecticut Fire Insurance Co. v. Wigginton, 134 Ark. 152, 203 S.W. 844; Snell v. Insurance Co., 98 U.S. 85, 25 L.Ed. 52; Home Insurance Co. of New York v. Sullivan Machinery Co., 10 Cir., 64 F.2d 765; Couch on Insurance, Vol. 6, Sec. 1391.

if I was fully covered, and he said I absolutely was unless I ran over a chicken, and we left and that is the last I saw Bob." Mrs. Callaway testified that when Knie quoted the rate on the public liability policy as $142.00, she thought that it was a high price, but said, "yes, it would pay to be covered on every accident and every liability, a business like that—a butane business."

Immediately after the transaction was closed, Callaway left town, and that same afternoon Knie went to the home of Mrs. Callaway for the purpose of collecting the premium on the policy, at which time she asked Knie if the policy "covered every accident, every fire, and every damage, so that W. L. Callaway would not be liable, for I wanted him fully insured", and Knie answered that Callaway was "fully covered from all of the accidents and fire". Neither Callaway nor his mother saw the policy until after a loss occurred on November 18, 1941, but the policy was delivered to the bank, together with the fire insurance policy, and was there placed in the file with the notes and mortgage. On September 17, 1941, fifteen days after the policy had been issued, the insurance company wrote to its agent, Knie, advising him that it would cancel out the policy except for the embarrassing situation in which he was placed; that under the circumstances it would continue the risk until the expiration date, after which he must place the risk elsewhere. The letter continued, "I do notice however that the exclusion endorsement which you have attached to the above risk has not been signed by the assured and witnesses, and we feel that this is important so that there will be no question in the event of a loss as to the exact coverage that is being afforded to the assured. Furthermore, such special exclusions in the eyes of the court are not considered as legal unless they are signed and witnessed. I shall appreciate if you will have an extra copy of this endorsement wording signed by the assured, witnessed, and returned at your earliest convenience." The agent did nothing towards obtaining the signature of the assured until November 17, 1941, when he mailed a copy of the endorsement to the insured at Hobart, Oklahoma, with a letter asking him to sign it. The letter and endorsement was received by the insured on the morning of November 18th, but the insured did not sign it. That evening an accident and explosion occurred, out of which arose the claims now asserted against the insurer, coverage for which is within the terms of the policy if the general endorsement is excluded, but if the endorsement is to be considered a part of the terms and conditions of the policy, there is no liability of the insurer for the claims asserted against the insured.

Immediately after the accident, Callaway called Knie, and Callaway testified that the first thing Knie asked him was whether or not he had signed the endorsement, and he stated he had not. Knie admitted in his testimony that he knew the type and kind of truck he was insuring, and that he told the insured that "he should carry some public liability insurance—that he might run into somebody," and quoted him rates. He further testified, "we didn't discuss anything about the policy except I called it liability insurance, and told him what the premium would be on it." When asked if he had told the insured if he was covered for all liability except if he should run over a chicken, he answered that he did not recall. He testified that he had authority to write policies, deliver the same, and to pass on the risk, but that he did not have the authority to write the policy involved here without the general endorsement, and that the general endorsement was on the policy when it was delivered to the bank. He also testified that he did not tell Callaway of the attached endorsement.

■■ Knie was a policy writing agent, and as such was authorized to enter into insurance contracts for and on behalf of the appellant, and his statements and conduct in connection therewith are binding upon his principal. Commercial Casualty Company v. Connellee, 156 Okl. 170, 9 P. 2d 952; Home Insurance Company of New York v. Sullivan Machinery Company, 10 Cir., 64 F.2d 765; Westchester Fire Insurance Company v. Federal National Bank, 135 Okl. 47, 273 P. 889, 891; Commercial Casualty Insurance Company v. Varner, 160 Okl. 141, 16 P.2d 118; United States Fire Insurance Company of New York v. Rayburn, 183 Okl. 271, 81 P.2d 313. He knew the type and the kind of risk to be insured; he also knew that with the attached endorsement, the insured would not have full coverage, and he had, according to the testimony, agreed to write a policy covering every accident, every fire, and every damage. The insured relied upon his representations by accepting the

policy and paying the premiums thereon, and having the same delivered to the bank along with the fire insurance policy. True, if the insured had read the policy, he would have found that it did not cover every accident and every damage, but in these circumstances we think the insured's failure to read the policy did not amount to negligence barring reformation. Home Insurance Company v. Sullivan Machinery Company, supra; Commercial Casualty Insurance Company v. Connellee, supra; Commercial Casualty Insurance Company v. Varner, supra.

■ We conclude that the evidence is amply sufficient to meet the required degree of proof to support the findings of the trial court, and its judgment thereon is not clearly erroneous. McCarthy v. Wynne, 10 Cir., 126 F.2d 620; Ryan v. Denver Union Terminal Ry. Company, 10 Cir., 126 F.2d 782.

The judgment is affirmed.